**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-2056**

---

CARYN DEVINS STRICKLAND,

Plaintiff – Appellant,

v.

NANCY L. MORITZ, The Hon., in her official capacity as Chair of the Judicial Conference Committee on Judicial Resources; ROBERT J. CONRAD, JR., in his official capacity as Director of the Administrative Office of the United States Courts; ALBERT DIAZ, The Hon., in his official capacity as Chief Judge of the Fourth Circuit and as Chair of the Judicial Council of the Fourth Circuit; JAMES N. ISHIDA, in his official capacity as Circuit Executive of the Fourth Circuit and as Secretary of the Judicial Council of the Fourth Circuit; JOHN G. BAKER, in his official capacity as Federal Public Defender of the Federal Public Defender for the Western District of North Carolina,

Defendants – Appellees.

---

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  William G. Young, Senior District Judge for the United States District Court for the District of Massachusetts, sitting by designation.  (1:20-cv-00066-WGY)

---

Argued:  June 30, 2025                                 Decided:  August 15, 2025
                        Amended:  August 18, 2025

---

Before W. Duane BENTON, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, Ronald Lee GILMAN, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, and Susan P. GRABER, Senior Circuit Judge of the United

States Court of Appeals for the Ninth Circuit, sitting by designation.[*]

---

Affirmed by published opinion. Senior Judge Gilman wrote the opinion, in which Judge Benton and Senior Judge Graber joined.

---

**ARGUED:** Caryn Devins Strickland, LAW OFFICE OF CARYN STRICKLAND, Lynn, North Carolina, for Appellant. Kevin B. Soter, UNITED STATES DEPARTMENT OF JUSTICE, for Appellees. **ON BRIEF:** Yaakov M. Roth, Acting Assistant Attorney General, Courtney L. Dixon, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

[*] Because all members of the United States Court of Appeals for the Fourth Circuit are recused in this case, a panel of judges from outside the Circuit was appointed for this appeal pursuant to 28 U.S.C. §§ 291, 294.

RONALD LEE GILMAN, Senior Circuit Judge:

Caryn Devins Strickland is an attorney who formerly worked at the Federal Public Defender's Office (FDO) for the Western District of North Carolina. She alleges that her supervisor sexually harassed her, following which the response of both the Fourth Circuit and the Administrative Office of the United States Courts purportedly violated her due-process and equal-protection rights guaranteed by the Fifth Amendment to the United States Constitution. The district court ruled in favor of the government on all of Strickland's claims after a bench trial.

Strickland now appeals that ruling, as well as the district court's previous summary-judgment ruling in favor of two of the individually named defendants. For the reasons set forth below, we **AFFIRM** both district court decisions. We also **DENY** Strickland's motion to unseal certain materials that she filed on the appellate docket, as well as her motion for summary reversal of the district court's decision based on the early withdrawal of her pro bono counsel.

## I.    BACKGROUND

The district court's bench-trial decision included approximately 75 pages of factual findings, which are largely undisputed. *See Strickland v. United States*, 744 F. Supp. 3d 477 (W.D.N.C. 2024). Rather than fully restate those detailed findings and the extensive procedural history of this case here, we refer to pages 488 to 567 of the district court's decision. We will, however, briefly summarize the court's findings, as well as several points of procedural history that are relevant to the issues on appeal.

## A.    The bench trial

Following a six-day bench trial, the district court issued a 127-page decision. The gist of the court's factual findings is as follows: While working at the FDO, Strickland made a good-faith claim of sexual harassment against her immediate supervisor, J.P. Davis. Anthony Martinez, Davis's supervisor and the FDO Unit Executive, responded by rearranging the organizational chart so that Strickland no longer reported to Davis and instructing Davis to cease contacting her. He also converted Strickland's sick leave to administrative leave so that she would not suffer financial harm from having taken sick leave to avoid contact with Davis, authorized full telework, and followed through on a previous plan to promote her to Assistant Federal Public Defender. Martinez later offered Strickland his own office at the unit's Asheville site. In parallel with this response, various Fourth Circuit and other judiciary employees became involved in the procedures outlined in the Employee Dispute Resolution (EDR) Plan that was applicable at the time. The Fourth Circuit since has revised its Plan, but all references in this opinion are to the applicable version.

The EDR Plan contained two distinct dispute-resolution pathways. Chapter IX allowed an employee to file a wrongful-conduct report, which led to an investigation and, if appropriate, discipline of the accused wrongdoer. Under Chapter X, an employee could request counseling and mediation to resolve the dispute. If counseling and mediation were unsuccessful, the employee could then file a formal Chapter X complaint, which would trigger a full evidentiary hearing conducted by a presiding judicial officer and which could result in a wide range of potential remedies.

4

Strickland formally reported to Martinez, in August 2018, that Davis was sexually harassing her. Martinez initiated a wrongful-conduct proceeding against Davis shortly thereafter. District Court and Probation Office Human Resources Specialist Heather Beam was subsequently appointed to complete the investigation required under Chapter IX. A month later, Strickland filed her own wrongful-conduct report, which included allegations against Martinez for retaliation and discrimination, along with a Chapter X request for counseling. Beam was then instructed to complete a unified investigation that would inform both the Chapter IX and Chapter X proceedings. Strickland later participated in the mediation phase of Chapter X. But she left the FDO and voluntarily withdrew from the EDR process before proceeding to the next stage of Chapter X—the filing of a formal complaint.

Several judiciary employees behaved imperfectly before and during the EDR process. In particular, "Davis was a controlling manager who . . . [took] actions that reasonably made Strickland uncomfortable." *Strickland*, 744 F. Supp. 3d at 563. Martinez, too, made thoughtless comments to Strickland—most notably, his use of a "marriage metaphor"—that she understandably believed was dismissive of her good-faith complaint. *See id.* at 509.

Judiciary employees who were responsible for the EDR process also made various missteps. Beam disrespected Strickland's expectations of confidentiality and failed to complete a thorough EDR investigation in a timely manner. Other well-intentioned employees, such as Fourth Circuit Chief Mediator Ed Smith and former Judicial Integrity Officer Jill Langley, carried out their duties with professionalism and integrity, but were at

times stymied by structural imperfections or a lack of clarity in the Plan.

The bench trial focused on two claims: First, that the government's implementation of the EDR Plan, as applied to Strickland, violated her due-process rights under the Fifth Amendment; and second, that Martinez violated her equal-protection rights under the Fifth Amendment by responding to her good-faith claim of sexual harassment with deliberate indifference and a "mixture" of retaliation and discrimination. The district court ruled in favor of the government on both claims, concluding that none of the government's various failures rose to the level of deliberate indifference, retaliation, discrimination, or a deprivation of due process.

## B.    Strickland's due-process claim

When Strickland filed her complaint in this case in 2020, it contained not only an as-applied due-process challenge to the EDR Plan, but also a facial challenge. Upon the government's motion to dismiss, the district court ruled in late 2020 that Strickland had not stated a due-process claim under either theory because she had not alleged a cognizable life, liberty, or property interest. This court reversed in part, holding that Strickland had adequately pleaded "that she has protected property interests that were created and defined by the EDR Plan." *Strickland v. United States*, 32 F.4th 311, 348 (4th Cir. 2022). Nevertheless, this court ruled that Strickland's facial challenge failed because, by its terms, Chapter X of the Plan provided sufficient procedural safeguards. *See id.* at 354–55.

But this court allowed Strickland's as-applied challenge to proceed, relying on the Seventh Circuit's opinion in *Spreen v. Brey*, 961 F.2d 109 (7th Cir. 1992). *See Strickland*, 32 F.4th at 355. Some background here is helpful. A plaintiff typically will not prevail on

6

a procedural-due-process claim unless the plaintiff has "taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Ashley v. NLRB*, 255 F. App'x 707, 710 (4th Cir. 2007) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Strickland abandoned the EDR process before utilizing her right to a Chapter X hearing, thus presumptively forfeiting her due-process claim. But there are exceptions to the general rule.

In *Spreen*, the plaintiff-employee was forced to choose between resignation and termination for cause. She alleged that she chose to resign, forgoing the post-termination procedures to which she otherwise would have been entitled, because the defendants misrepresented to her that she would lose her benefits if she were terminated. The Seventh Circuit held that, by making this material misrepresentation, on which the plaintiff "reasonably rel[ied]," *see Spreen*, 961 F.2d at 113, the defendants had coerced the plaintiff to resign. She therefore stated a procedural-due-process claim for deprivation of the post-termination procedures. *See id.*

In the present case, this court analogized that Strickland could show a deprivation of procedural due process if she proved that she was coerced to abandon her complaint before proceeding to the Chapter X hearing. *Strickland*, 32 F.4th at 355. She could prove coercion, in turn, by showing that she "was led to believe" that Martinez would be the final decisionmaker in the EDR process. *Id.* Such a consideration would be material to Strickland's decision to drop her complaint because, if Martinez were indeed the final decisionmaker, "a reasonable factfinder could conclude that continuing with the EDR process would be futile and that Strickland had reason to believe that the more suitable

7

alternative was to drop her complaint and accept the Fourth Circuit clerkship" that was offered to her. *Id.* at 356.

## C.    Strickland's equal-protection claim and the "Me Too" evidence

Strickland's equal-protection claim likewise narrowed during pretrial proceedings. Her complaint alleged that Martinez, Fourth Circuit Executive James Ishida, and Fourth Circuit Chief Judge Roger Gregory all violated her equal-protection rights. In 2023, the government moved for summary judgment on Strickland's equal-protection claim against all defendants. Strickland opposed the motion and cross-moved for summary judgment on her claim against Martinez.

In connection with her motion, Strickland moved to file a proposed exhibit under seal. She then filed a fully redacted exhibit—that is, with entirely blank pages—six days later. Unredacted, the exhibit contained 77 pages of materials that Strickland refers to as the "Me Too" evidence. It consisted of four requests for counseling or mediation under Chapter X of the EDR Plan, as well as follow-up materials. Each request detailed accusations of gender-based discrimination or harassment by Martinez, Davis, and others at the FDO; accusations of retaliation by Martinez; or both types of accusations. All of the inappropriate behavior was alleged to have taken place in the year before or within several years after the events that gave rise to Strickland's suit. What follows is a highly abridged procedural history regarding this evidence.

The district court never ruled on Strickland's motion to file her summary-judgment exhibit under seal. In July 2023, it denied the cross-motions regarding Martinez, ruling that the claim could proceed to trial. It also granted the government's motion for summary

8

judgment regarding Ishida and Chief Judge Gregory. The court concluded that no reasonable juror could find that either Ishida or Chief Judge Gregory acted with discriminatory intent. Strickland filed a motion for reconsideration. She argued, among other things, that the court had not considered the content of her proposed Me Too exhibit. The court denied her motion.

At trial, Strickland once again attempted to introduce the Me Too evidence under seal. The district court allowed her to label the sealed materials as Trial Exhibit BB. But when she sought to admit the materials, the court ruled the exhibit inadmissible on hearsay and relevance grounds. The court then ruled in favor of Martinez on Strickland's equal-protection claim.

After trial, Strickland moved to unseal "all orders and directions sealing this case," which the district court also denied. She then filed a motion in this court for permission to file a mostly unredacted version of several documents from the district court, including a version of the Me Too evidence that contained minor redactions to protect the identities of the complainants and certain third parties. This court issued an order "defer[ring] consideration of the motion to unseal pending review of the appeal on the merits."

## II.      ANALYSIS

On appeal, Strickland challenges the district court's due-process and equal-protection rulings. She raises two challenges regarding due process. Strickland first argues that the court erred in determining that she did not reasonably believe that Martinez would be the final decisionmaker on her EDR complaint. Next, she contends that the court failed to consider that "an accumulation of errors" in the EDR process rendered it "fundamentally

9

unfair," which coerced her to abandon the process prematurely. Regarding her equal-protection claims, Strickland argues that the court erred in not concluding that (1) Martinez was deliberately indifferent to her being sexually harassed by Davis, and (2) Martinez subjected Strickland to a mixture of retaliation and discrimination in response to her complaint.

Strickland also appeals the district court's grant of summary judgment in favor of Ishida and Chief Judge Gregory. She further contends that the court erred by excluding the Me Too evidence, both when considering summary judgment and then at trial. In addition, Strickland contends that Title VII's exclusion of judiciary employees is unconstitutional as applied to her.

We will address all of the above arguments in turn. Finally, we will analyze Strickland's motion to unseal the Me Too evidence on the appellate docket, as well as her motion for summary reversal based on the early withdrawal of her pro bono counsel.

## A.  Legal standard

This court reviews a grant of summary judgment de novo and draws "[a]ll inferences . . . in a light most favorable to the non-movant." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (quoting *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)). We review a judgment following a bench trial under a "mixed standard of review," with the district court's legal conclusions being reviewed de novo and its findings of fact being reviewed "for clear error." *Heyer v. United States Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021) (quoting *Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005)). Factual findings will not be reversed unless they were derived under an incorrect

10

legal standard, they ignore substantial evidence supporting the opposite conclusion, or they are contrary to the clear weight of the evidence. *Id.*

## B. Due process

### i. *Strickland's belief that Martinez would be the final decisionmaker on her complaint was unreasonable*

As this court previously held, Strickland could prevail on her due-process claim if she proved that she was "led to believe" that Martinez would be the final decisionmaker on her complaint. *See Strickland*, 32 F.4th at 355. Strickland argued at trial that statements by Smith (the Fourth Circuit's Chief Mediator) and Langley (the former Judicial Integrity Officer) led her to believe that Martinez would be the de facto decisionmaker on remedies. She contended that, based on these statements, she believed that the presiding judicial officer in the Chapter X hearing would either not order any remedies or would not have the power to force Martinez to comply with whatever remedies were ordered. The district court found that Strickland genuinely believed that Martinez would be the final decisionmaker, but it determined that this belief was unreasonable. *See Strickland*, 744 F. Supp. 3d at 599.

Regarding Smith, the district court found that, although Smith expressed frustration about the remedies available through the EDR process and encouraged Strickland to reach a settlement, his statements could not reasonably have given rise to the beliefs that Strickland professed. The court noted that Smith's "frustration stem[med] from the remedies available to any and all complainants, and not with who would be administering those remedies." *Id.* at 596. It also found that Smith's comment that "[Martinez] does

11

have a boss. It's the chief judge. He can be removed." would have "unequivocally refuted any concern from Strickland that a presiding judicial officer could not order remedies within the Federal Defenders' Office." *Id.* at 597.

Concerning Langley, the district court found that her uncertain statements—for instance, Langley told Strickland that she "literally did not know" what would happen if Martinez refused to comply with the presiding judicial officer's orders, but that Martinez was "obligated under the plan to take those remedies," *see id.* at 551—would not reasonably have led Strickland to believe that Martinez would refuse to follow orders given by the presiding judicial officer. The court reasoned that "Langley's uncertainty, as conveyed to Strickland, did not rise to telling Strickland unequivocally that Martinez would be the final decisionmaker on Strickland's remedies following her Chapter X hearing," and that "any belief otherwise based on these statements was unreasonable." *Id.* at 598.

In addition, the district court found that Strickland's belief required her to disregard the plain text of the EDR Plan itself, which provides that the presiding judicial officer in a Chapter X hearing "may order a necessary and appropriate remedy." The court concluded that "[f]or Strickland to believe, on the basis of not only 'extratextual,' but also uncertain and out-of-context statements, that the presiding judicial officer would not be able to order remedies as stated in the EDR Plan was unreasonable." *Id.* at 599.

Strickland responds by arguing that the district court's focus on Langley's uncertainty "misconstrues the legal standard." She contends that "the issue is not whether Langley was certain about her convictions, but rather whether it was reasonable for Strickland to rely on her statements expressing uncertainty."

12

True enough, this court's prior opinion held that Strickland could prevail if she was "led to believe"—not necessarily by the government alone, and not necessarily by a direct misrepresentation—that Martinez would be the final decisionmaker regarding remedies imposed through the Chapter X proceeding. *See Strickland*, 32 F.4th at 355. That flexibility left the door open for Strickland to prove that external circumstances, such as the lack of clarity regarding the relationship between the Fourth Circuit and the FDO, as well as statements that were not direct misrepresentations, contributed to her belief that Martinez would be the final decisionmaker. But Strickland cannot prevail on her claim simply by proving that she was led to be "uncertain" about Martinez's authority. The district court, therefore, did not "misconstrue the legal standard" by focusing on Langley's uncertainty and on whether Strickland "reasonably believed," *see Strickland*, 744 F. Supp. 3d at 595, that Martinez would be the final decisionmaker, *see also id*. at 598 (opining that "[r]easonable uncertainty, . . . and even reasonable concern, does not rise to the level of conviction").

Strickland also points to a variety of other external circumstances, such as the subsequent adoption of a separate EDR Plan for FDOs, that she says were "based on concerns about independence" and reflect legitimate confusion "about how personnel actions could be enforced against federal defender offices." We first note that some of these external circumstances were not presented at trial and therefore have no bearing on our analysis of whether the district court clearly erred.

But our conclusion would not change even if we did consider this evidence. The evidence, at most, corroborates the reasonable uncertainty that might have resulted from

13

Langley's statements.  Uncertainty alone, however, is insufficient to satisfy the standard defined by this court.  *Id.*

We also note that Martinez's actions during the EDR process would not have led a reasonable person to believe that he would refuse to comply with any remedies that were mandated as a result of the Chapter X hearing.  Martinez testified "that he would, of course, have done whatever Chief Judge Gregory had recommended."  *Id.* at 603 n. 143.  Martinez might have lacked an understanding about the seriousness of workplace sexual harassment generally, and he might have made thoughtless comments to Strickland, such as the "marriage metaphor."  But there is no evidence that this thoughtlessness and lack of understanding influenced the concrete actions that Martinez took in response to Strickland's good-faith complaint.  He demonstrated a willingness to accommodate Strickland during the EDR process, including the granting of her telework request and offering her the use of his own office space in Asheville.  These facts make all of the alleged confusion about Martinez's authority to eschew orders from a Chapter X hearing officer a nonissue.

Strickland further argues that the district court failed to consider, or afford appropriate weight to, several of Smith's statements during the Chapter X mediation process.  She asserts, for example, that Smith told her that "'[n]one' of the remedies under the plan are 'going to do anything' because the only remedy that would be effective was discipline for misconduct."

Strickland correctly notes that Smith expressed frustration about what he viewed as the poor fit of the available EDR remedies to Strickland's case.  But whatever Smith's

14

opinions about the efficacy of the remedies, Strickland points to no evidence that he told her that the hearing officer would not order those remedies or that those remedies were otherwise unavailable.

Strickland also argues that "the [district] court did not consider Smith's statements that he was 'not disagreeing' with concerns that 'the hearing officer can't do anything,' and a hearing would be a 'sham' and a 'kangaroo court.'" But the district court analyzed this conversation in detail, and it properly concluded that this conversation did not reasonably lead Strickland to believe that the judicial officer would refuse to order remedies. *See id*. at 596–97.

As the district court found, Smith repeatedly lamented the limits of the EDR process and expressed doubt that the available remedies would make Strickland comfortable in the office again. But Smith's agreement with Strickland's concern that "the hearing officer can't do anything because they're not going to micromanage the office" could not reasonably be interpreted, in context, as an unequivocal statement that the hearing officer would not order any remedies. His statement was more a commiseration about the limitations inherent in the EDR process and inherent in an employee's continuing to work in an office where she experienced past harassment. We believe that a more reasonable interpretation of the "anything" comment, *see id*., would be "anything that would address all of Strickland's concerns."

Strickland also challenges the district court's finding that the "[h]e can be removed" comment "unequivocally refuted any concern from Strickland that a presiding judicial officer could not order remedies." *Id.* at 597. She argues that whether Martinez could be

15

removed for refusing to comply with remedies ordered by the presiding judicial officer remains unclear, and that "the court acknowledged that there is no mechanism for a federal defender to be removed as a result of an EDR proceeding."

Strickland is mistaken.  The district court noted that, although "the point is regrettably obscure," the EDR Plan "as written vests in [the presiding judicial officer] the authority to make employment decisions." *Id.* at 603.  Further, the court opined, "if we're serious, the [judicial officer] must have that authority" unless there is a court rule or statute to the contrary.  *Id.*  Strickland might have had some concern about whether this was the case.  But even if Strickland *believed* that this was not the case, the court properly concluded that her belief was unreasonable.

Finally, Strickland argues that Martinez would in fact be the final decisionmaker because he alone was responsible for disciplining Davis.  But Martinez's authority to discipline Davis has no relevance to whether Martinez would be the final authority on Chapter X remedies which, as noted, Strickland did not pursue.  Those remedies do not include discipline, which can be achieved only through a Chapter IX wrongful-conduct proceeding.  Martinez's disciplinary role means, at most, that the Chapter IX process, standing alone, might have been procedurally inadequate.

But, as we will explain in greater detail below, Strickland cannot prevail on her due-process claim based on a theory that the Chapter IX process insufficiently vindicated her due-process rights.  Even if the Chapter IX process was inadequate, Strickland had the option to invoke the robust procedures in Chapter X, which this court has already determined are facially adequate.  That process would not have resulted in discipline.  But

16

it made available a variety of other remedies, including placement in a comparable position, promotion, or leave. *See Strickland*, 744 F. Supp. 3d at 494 n. 14. And as the record shows, the government was willing to provide Strickland with other remedies, including telework, transfer out of Davis's chain of command, and transfer to the Asheville office. Strickland does not explain persuasively why those remedies were insufficient to vindicate her substantive right under the EDR Plan to be free of sexual harassment and discrimination.

#### ii. The EDR process was not so "fundamentally unfair" that it violated Strickland's due-process rights or coerced her to abandon the process

Strickland further contends that her due-process rights were violated because of the "fundamental[] unfair[ness]" of the EDR process as it was applied to her. First, she argues that "an accumulation of errors" in the government's application of the EDR Plan, such as breaches of confidentiality and Martinez's participation in the process, rendered the process constitutionally inadequate. She next argues that the government's implementation of the EDR process was so problematic that it coerced her into withdrawing from the process prematurely, which deprived her of the procedures available under Chapter X.

The district court rejected both arguments and declined to consider them on their merits. It concluded that, under this court's previous opinion, the only pathway for Strickland to establish a due-process violation was to prove that she reasonably believed that Martinez would be the final decisionmaker on her EDR complaint. The district court characterized Strickland's fundamental-unfairness argument as an impermissible "[a]ttempt[] to [b]roaden the Fourth Circuit's [h]olding" regarding due process. *Id.* at 599.

17

Strickland, on the other hand, argues that she can prove a due-process violation if she shows that she was in any way pressured to abandon the EDR process.

We are unpersuaded by both the district court's and Strickland's differing interpretations of this court's prior opinion. That opinion held that Strickland adequately pleaded a violation of due process by alleging that she was coerced to abandon her complaint because she was led to believe that Martinez would be the final decisionmaker. As the district court observed, Strickland's interpretation of this court's ruling improperly collapses the two steps of the holding into a single step of coercion, *see Strickland*, 744 F. Supp. 3d at 600, and she appears to suggest that *any* action that pressured her to abandon the EDR process would amount to a due-process violation. Strickland argues, for example, that the decision to hold discipline in abeyance during the Chapter X proceeding violated her due-process rights. We reject Strickland's overbroad interpretation.

On the other hand, the district court read this court's opinion too narrowly. The opinion simply acknowledged that Strickland's allegation that she was misled about Martinez's role in the EDR process was one way in which her complaint stated a due-process claim. That was all that was required at the motion-to-dismiss stage. This court did not rule that all other combinations of allegations in Strickland's complaint failed to state a due-process claim, nor did it explicitly preclude Strickland from proving a violation of due process by other means at trial. To do so at the motion-to-dismiss phase would have been premature.

In the prior opinion, this court correctly recognized that the contours of Strickland's claim—that she was coerced to forgo procedural protections to which she had a due-

18

process right—are highly analogous to those of a coerced-resignation claim. *See Strickland*, 32 F.4th at 355. This court acknowledges that several theories of coerced resignation can trigger a due-process violation, only one of which is encompassed by the rule in *Spreen*. *See, e.g.*, *Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413 (4th Cir. 2010). We thus see no justification for limiting Strickland solely to the *Spreen* type of coercion.

We can, however, affirm the district court's decision in spite of its failure to consider these alternative theories if we conclude that the error was harmless. *See Gator Tail, LLC v. Mud Buddy LLC*, 618 F. App'x 992, 1000 (Fed. Cir. 2015) (concluding that the district court's application of the incorrect legal test at a bench trial was harmless); *Mungo v. Taylor*, 355 F.3d 969, 976 (7th Cir. 2004) (same); *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir. 1990) (holding that, although the district court at a bench trial "erred in its choice of legal principles, the error was harmless because [the prevailing party] would have prevailed under the applicable legal principles").

We recognize that we could remand this issue to the district court for further analysis. In this case, however, the relevant factors weigh in favor of our analyzing Strickland's alternative theories in the first instance. To start, the underlying facts in the district court's opinion are mostly undisputed, making this predominately a legal question. Deciding the issue now would also not prejudice Strickland because she expanded her due-process argument before the district court beyond the contention that she was led to believe that Martinez would be the final decisionmaker. Instead, she argued more generally that the process was unfair and that she was coerced to end it for a variety of reasons.

19

The government, in contrast, appears to have relied on the district court's opinion to somewhat constrain its due-process briefing. But the government would not be prejudiced because, as we explain below, Strickland's alternative due-process theories clearly fail—even without the benefit of the government's briefing on this issue. *See United States v. Faulls*, 821 F.3d 502, 512 n.4 (4th Cir. 2016) ("Although we generally do not consider issues not passed upon below, the question before us is purely one of law, and we perceive no injustice or unfair surprise in doing so here.").

### 1.  *Accumulation of errors*

Strickland's first "fundamental unfairness" argument—that an accumulation of errors and irregularities in the EDR process violated her due-process rights—does not fit within the coerced-resignation framework. Her argument, moreover, is foreclosed by the structure of the EDR Plan.

In general, a plaintiff can prove a due-process violation by showing that she was denied the "minimum measure of procedural protection warranted under the circumstances." *Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996). The "basic requirements" of due process are "notice and an opportunity to be heard," but "due process is flexible and calls for such procedural protections as the particular situation demands." *D.B. v. Cardall*, 826 F.3d 721, 743 (4th Cir. 2016) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). An opportunity to be heard "need not be an adversarial hearing, a full evidentiary hearing, or a formal hearing." *Id*. (internal quotation marks omitted).

All of the procedural errors about which Strickland complains happened before the

Chapter X hearing procedures commenced.  To rule in Strickland's favor, we would have to conclude that she was entitled to due-process protection within the Chapter IX investigation and the Chapter X counseling and mediation stages alone, without regard to the protections in the later stages of Chapter X.  Such an expectation, as the government points out, is at odds with the structure of the EDR Plan.  The district court determined, and Strickland does not appear to dispute, that "Chapter IX does not provide any employee with any rights or remedies."  *Strickland*, 744 F. Supp. 3d at 494.  Instead, the "clear and specific set of procedures that are to be followed in the event that an employee claims that his or her substantive rights . . . under the EDR Plan have been violated," *see Strickland*, 32 F.4th at 349–50, are found in the Chapter X hearing.

Complaints about the earlier stages of the EDR process are especially unconvincing here because the full evidentiary hearing guaranteed by Chapter X is at the upper end of procedural safeguards.  Strickland would have had the opportunity to take discovery, present evidence, and cross-examine witnesses.  The presiding judicial officer would have made a final determination on her complaint, and Strickland could have appealed any adverse decision.  Such a hearing plainly would have provided the "minimum measure of procedural protection warranted under the circumstances."  *See Mallette*, 91 F.3d at 634.  And this court has already rejected Strickland's challenges to the facial adequacy of a Chapter X hearing.

Strickland's attempts to assert an as-applied challenge to the adequacy of that hearing also run afoul of the rule that, to prevail on a due-process claim, "a plaintiff must have taken advantage of the processes that are available to him or her, unless those

21

processes are unavailable or patently inadequate." *Ashley v. NLRB*, 255 F. App'x 707, 710 (4th Cir. 2007) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)); *see also Dotson v. Griesa*, 398 F.3d 156, 161 n.2 (2d Cir. 2005) (collecting cases); *cf. Strickland*, 32 F.4th at 355 (holding that Strickland's failure to make use of an available procedure to request the disqualification of Chief Judge Gregory "prevents her from now asserting that his involvement automatically violated her due process rights" (citing *Dotson*, 398 F.3d at 161 n.2)).

To the extent that Strickland argues that the Chapter X procedures, as applied to her, would have been "patently inadequate," *see Ashley*, 255 F. App'x at 710, that argument fails. Procedures are patently inadequate when they are "absolutely blocked or there is evidence that the procedures are a sham." *Alvin*, 227 F.3d at 118. Strickland asserts that (1) the process was unreasonably delayed, (2) the Plan could not afford her effective relief because the imposition of counseling for Martinez was held in abeyance and because Martinez was the only one who could discipline Davis, and (3) the administrative body that would decide the complaint was biased because Martinez would be the de facto final decisionmaker.

Concerning the timeframe, Strickland correctly notes that the district court found that the Chapter IX investigation took "far too long." *Strickland*, 744 F. Supp. 3d at 565. But the court attributed that delay to Beam, the appointed investigator, who was not involved in the Chapter X hearing process. There was no indication that the Chapter X hearing process—the process of which Strickland failed to avail herself—would have been delayed, let alone to an unreasonable degree. Accordingly, the delay does not support a

22

claim that the Chapter X hearing was "absolutely blocked" or a "sham." *See Alvin*, 227 F.3d at 118.

Regarding the efficacy of remedies, Strickland's dissatisfaction with the remedies available through the Plan also does not establish that the Plan's process was a sham. Strickland does not dispute that a variety of remedies were available under Chapter X, even if discipline was not one of them. She cites no authority for the principle that a procedure is patently inadequate if it cannot result in the complainant's preferred relief, or even the most tailored, ideal relief under the circumstances; such a rule would be unworkable.

Finally, as described above, Strickland has not shown that, contrary to the text of the EDR Plan, Martinez would have in practice been the final decisionmaker on her complaint, nor that she reasonably believed that he would be. Her accumulation-of-errors argument therefore fails.

### 2. *Coercion*

Moving on to Strickland's coercion argument, we analyze whether Strickland could prevail under any applicable legal standard for a coerced resignation. This court's previous opinion analogized to the standard for the one sub-type of coerced resignation that was outlined by the Seventh Circuit in *Spreen*. But broadly speaking, this court recognizes two types of coerced resignation: (a) involuntary resignation (which includes the sub-type outlined in *Spreen*) and (b) constructive discharge. We read Strickland's brief to invoke both, so we will address each argument in turn.

We emphasize at the outset that we apply the coerced-resignation theories by analogy. The relevant inquiry is whether Strickland was coerced to abandon the EDR

23

process, not whether she was coerced to resign.  Even if Strickland were able to show that flaws in the process or working conditions pressured her to quit her job, this would not establish that she was pressured to abandon the EDR process.  The government aptly points out the disconnect between the two concepts:

> Nothing precluded plaintiff from continuing to pursue her Chapter X claim after leaving the Federal Defender's Office.  To the contrary, the EDR Plan expressly extends coverage to former employees, see EDR Plan, Ch. I, § 3, and provides for remedies such as reinstatement that necessarily extend to former employees, see EDR Plan, Ch. X, § 12.

### a. Involuntary resignation

"A resignation is involuntary when it is obtained either through material misrepresentation, or by duress or coercion."  *Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413 (4th Cir. 2010) (citing *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988)).  "Under the misrepresentation theory" (the theory in *Spreen*), "a resignation may be found to be involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation.  A misrepresentation is material if it concerns either the consequences of the resignation or the alternative to resignation."  *Stone*, 855 F.2d at 174 (internal quotation marks and citations omitted).

"Under the duress/coercion theory, a resignation may be found involuntary if on the totality of [the] circumstances it appears that the employer's conduct . . . deprived the employee of free choice in the matter."  *Id*.  Circumstances to be considered are:  "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a

reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." *Id.*

"[T]he assessment [of] whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation—for example, because of concerns about his reputation—is irrelevant." *Id*. "[T]he mere fact that [an employee's] choice is between comparably unpleasant alternatives—e.g., resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Id.*

Strickland argues that she was coerced to end the EDR process for a variety of reasons, one of which was that she believed that Martinez would be the de facto final decisionmaker. Because we have already determined that the district court did not err in finding that belief unreasonable, we focus here on the remaining circumstances that Strickland characterizes as coercive: that the failure to recuse Martinez from the entire EDR process, as well as breaches of confidentiality and other errors during the Chapter IX investigation, rendered the entire process biased; that the breaches of confidentiality damaged Strickland's reputation and embarrassed her; and that the counseling that Martinez was slated to receive as a result of the Chapter IX investigation was held in abeyance until the resolution of the entire EDR process.

We acknowledge that any of these circumstances—the perceived bias in the investigation, the prospect of embarrassing or damaging allegations leaking to colleagues, or the desire to speed up the imposition of discipline—could cause a reasonable person to

25

drop her complaint. But that is not the legal standard. To prevail on her due-process claim under the theory of involuntary resignation, Strickland was instead required to show that the government's conduct "effectively deprived [her] of free choice in the matter." *See id.*

The circumstances that Strickland highlights in her brief certainly forced her to choose between dropping her complaint and the "comparably unpleasant alternative[]," *see id.*, of completing the process. But that is insufficient to demonstrate involuntary resignation. *Cf. id.* at 174–75 (holding that a resignation was voluntary when the employee was forced to choose between resignation and facing disciplinary charges, and "that the employee may perceive his only option to be resignation—for example, because of concerns about his reputation—is irrelevant"); *see also Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (holding that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges" because, in such cases, "the fact remains that plaintiff *had a choice*. [Plaintiff] could stand pat and fight." (internal quotation marks omitted) (emphasis in original)).

To the extent that Strickland believed that errors in the EDR process deprived her of a real chance to "stand pat and fight," *id.*, this belief was unreasonable. The various procedural failures that Strickland has identified pertain to the Chapter IX investigation and the counseling and mediation phases of Chapter X. Some of these regrettable missteps likely made the Chapter IX investigation report less reliable. But Strickland does not explain how these failures would have deprived her of a fair fight in the Chapter X hearing to which she was entitled had she continued with the EDR process.

Strickland counters by pointing out that the flawed Chapter IX investigation report

26

would have been provided to the presiding judicial officer and that Martinez's views would be sought as the Unit Executive during the Chapter X proceeding. But Strickland cannot persuasively argue that any input by Martinez would render the entire Chapter X process irreparably biased, just as an adverse or even dishonest witness would not turn an otherwise fair proceeding into a sham. As for the Chapter IX investigation report, Strickland could have requested that the report be excluded. And even if that request were denied, the presiding judicial officer would nevertheless have made his or her own independent judgment on Strickland's case. The officer would have done so after both sides took discovery, presented evidence, and cross-examined witnesses.

Given these robust procedures, there is no basis to conclude that the availability of a biased report would have made the Chapter X hearing a sham. *See Stone*, 855 F.2d at 169, 174 ("[T]he assessment whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation."). For the same reasons, there is nothing in the Chapter X procedures that would render the hearing "patently inadequate." *See Ashley v. NLRB*, 255 F. App'x 707, 710 (4th Cir. 2007) (internal quotation marks omitted). We accordingly reject Strickland's involuntary-resignation argument.

### b.  *Constructive discharge*

This leaves the issue of constructive discharge. Such a discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). A plaintiff asserting a constructive-discharge claim in the due-process context must

27

"prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Id.* Intolerability of the working conditions

> is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign. An employee may not be unreasonably sensitive to his working environment. Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.

*Id.* (internal quotation marks and citations omitted).

Strickland has not shown "a calculated effort to pressure" her into dropping her complaint "through the imposition of unreasonably harsh conditions." *See id*. Again, Strickland complains that the Chapter IX investigation was biased, that Beam and Ishida breached her expectations of confidentiality, and that Martinez's counseling was held in abeyance until the completion of the EDR process. These circumstances understandably proved frustrating and stressful, and Strickland might have reasonably decided that she preferred not to see the process through to the end. But "frustrations, challenges and disappointments" do not rise to the level of constructive discharge. *See Goldsmith v. Baltimore*, 987 F.2d 1064, 1072 (4th Cir. 1993) (holding that "isolated incidents" did not rise to the level of constructive discharge and that "a certain amount of conflict" was inevitable in the plaintiff's position).

Strickland, moreover, does not argue that any of the government's failures during the EDR process constituted deliberate efforts to pressure her to abandon the process. In

28

fact, she asserts that "intent is not an element of a due process claim." But Strickland confuses the legal standard for a Title VII constructive-discharge claim—which does not require proof of intent by the employer—with the legal standard for a due-process constructive-discharge claim. *See id.* (holding that a plaintiff asserting constructive discharge in a due-process context must "prove two elements: deliberateness of the employer's action, and intolerability of the working conditions").

Strickland not only fails to present evidence of deliberateness, but in fact explicitly attributes several of the conditions of which she complains to negligence. She acknowledges, for example, that Beam "did not consider the possibility" that breaches of confidentiality in the EDR process "might expose Strickland to retaliation." And Strickland does not dispute that Ishida's decision to hold discipline in abeyance was driven by "pragmat[ism]" rather than "malic[e]" or a "desire to coerce Strickland." For these reasons, Strickland has fallen well short of proving her due-process claim on a constructive-discharge theory.

We also note that Strickland complains of other unfavorable working conditions, such as teleworking and hostility from coworkers, in the context of her equal-protection constructive-discharge claim. But Strickland does not argue that the working conditions of which she complains were part of a "calculated effort," *see id.*, to pressure her to abandon her complaint.

And, as noted at the outset, even if working conditions had pressured Strickland to quit her job, this would not establish that she was pressured to abandon the EDR process. Nothing in the record suggests that, after she accepted the Fourth Circuit clerkship, anyone

pressured her to withdraw her EDR claim, which she chose to do voluntarily. *Strickland*, 744 F. Supp. 3d at 554.

In sum, we conclude that Strickland's coercion argument is unpersuasive. Because we affirm the court's rejection of Strickland's due-process claim, we necessarily reject Strickland's argument concerning the appropriate remedies for a due-process violation.

## C. Equal protection

We next address Strickland's challenges to the district court's equal-protection rulings. At trial, the court rejected Strickland's arguments that Martinez violated her equal-protection rights by responding to her good-faith complaint with deliberate indifference, and by subjecting her to a mixture of retaliation and continued sexual harassment. And at summary judgment, the court rejected her argument that Ishida and Chief Judge Gregory were deliberately indifferent to her sexual-harassment complaint.

We will address the district court's trial decision first, followed by its summary-judgment ruling. Finally, we will analyze Strickland's argument that the court erred, both when considering summary judgment and then at trial, by refusing to admit the Me Too evidence.

### i. *The district did not err in finding no merit to Strickland's claim that Martinez was deliberately indifferent to Strickland's sexual-harassment complaint*

"[T]he Fifth Amendment's Equal Protection Clause secures a federal judiciary employee's right to be free from sexual harassment in the workplace. It thus both guards against sexual harassment perpetrated by other federal judiciary employees and protects federal judiciary employees from deliberate indifference on the part of federal judicial

employees charged with preventing sexual harassment and investigating complaints of sexual harassment." *Strickland*, 32 F.4th at 359. "[F]ederal judiciary employees who occupy supervisory roles and/or who are charged with enforcing an EDR plan can, under *Feminist Majority Foundation*, be held liable under the Fifth Amendment for their deliberate indifference to sexual harassment committed by a federal judiciary employee or supervisor against another federal judiciary employee." *Id.*, discussing *Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018). "The elements of [a deliberate indifference equal protection] claim . . . are essentially identical to those outlined by the Fourth Circuit in *Feminist Majority Foundation*: (1) the plaintiff was subjected to sexual harassment by another employee or supervisor; (2) the plaintiff alerted supervisory officials and/or officials responsible for overseeing the court's EDR plan about the sexual harassment; (3) the supervisory officials and/or officials responsible for overseeing the court's EDR plan responded to the allegations with deliberate indifference; and (4) the deliberate indifference was motivated by a discriminatory intent." *Id.*

The district court did not discuss all four elements of the test because it concluded that the evidence did not satisfy either element three—deliberate indifference—or element four—discriminatory intent. With respect to the former, supervisors are deliberately indifferent when they respond to sexual harassment "in a manner clearly unreasonable in light of known circumstances." *Feminist Majority Found.*, 911 F.3d at 702 (internal quotation marks omitted). The supervisor must have "kn[own] about harassment of the plaintiff and acquiesced in that conduct by refusing to reasonably respond to it." *Id.* at 702–03 (internal quotation marks omitted).

31

In the present case, the district court found that Martinez took the following steps to remedy the harassment alleged by Strickland:  He promptly initiated a Chapter IX investigation, removed Davis as Strickland's supervisor, instructed Davis not to contact Strickland, implemented a "gatekeeper" to ensure that Strickland would not be assigned work from Davis, took Strickland out of Davis's chain of command, and granted her request to telework.  Martinez later, during mediation, offered Strickland his own office space at the Asheville unit.  As a result, Strickland and Davis had "no further meaningful contact," and Strickland "did not see Davis again" once she began teleworking.  *Strickland*, 744 F. Supp. 3d at 574.  The court properly concluded that, on this record, Martinez's actions were not a "clearly unreasonable" response to Strickland's sexual-harassment complaint.  *See Feminist Majority Found*., 911 F.3d at 702.

Strickland, however, points to numerous missteps and misjudgments by Martinez, such as his "marriage metaphor" remark and apparent suspicion of her complaint.  In addition, she brings up actions by others that she characterizes as errors, including Chief Judge Gregory's decision not to formally disqualify Martinez from the EDR process, Beam's breaches of confidentiality during that process, and Ishida's refusal to allow interim relief.  Strickland correctly points out that acts by other employees should inform the deliberate-indifference analysis, given that her claim against Martinez is an official-capacity claim.  But "[i]t is not enough simply to point to what could or should have been done." *Koon v. North Carolina*, 50 F.4th 398, 406 (4th Cir. 2022) (analyzing a deliberate-indifference claim in the ADA context).

None of the actions by Martinez or the others mentioned by Strickland undermined

32

the reasonable, concrete steps that Martinez took to protect Strickland from the alleged harassment. The district court accordingly did not err in concluding that Strickland failed to meet her burden on the third prong of the deliberate-indifference test. And to the extent that the court did not appropriately consider the actions of other employees in its analysis, that error was harmless.

We similarly reject Strickland's argument that the district court clearly erred by not relying on the opinion of Strickland's workplace expert, Vida Thomas. As Strickland acknowledges, Thomas provided an opinion regarding "guidance about 'standards of care' and 'departure[s] from typical adjudicatory or procedural norms.'" In other words, Thomas opined on "what could or should have been done." *See id*. The court instead correctly evaluated whether the response to Strickland's complaint was "clearly unreasonable," *see Feminist Majority Found.*, 911 F.3d at 702, and correctly concluded that it was not.

Strickland also suggests that we should place particular importance on the lack of disciplinary action against Davis in analyzing the reasonableness of the government's response. She relies on this court's recent decision in *Blair v. Appomattox Cnty. Sch. Bd.*, No. 24-1682, 2025 WL 2249351 (4th Cir. Aug. 7, 2025), involving a high school administration that took woefully inadequate actions to prevent a transgender student from being bullied by classmates. But the deliberate indifference in that case bears no resemblance to the effective steps taken by Martinez to separate Strickland from Davis in the present case.

Strickland next argues that the response to her complaint made her "vulnerable to future harassment," which she claims is evidence that the response constituted deliberate

33

indifference. *See Doe v. Fairfax Cty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cir. 2021). But the district court correctly found that the only communication that Strickland received from Davis after she made her complaint was a single email to a client on which Strickland was copied. Although the court did not make a finding regarding whether that particular email constituted sexual harassment, there is no showing in the record that the actions or inactions of any judiciary employee made Strickland vulnerable to further harassment by Davis. Instead, the record shows that Davis sent the email *in spite of* actions that were reasonably calculated to prevent him from doing so, including telling Davis not to contact Strickland and removing her from his chain of command.

Strickland's argument regarding the FDO's lack of training for handling sexual-harassment complaints also fails. She contends that the responses of Martinez and the other judiciary employees to her complaint were a highly predictable consequence of a lack of training on the handling of sexual-harassment complaints. But the district court correctly determined that Martinez's and the other judiciary employees' responses did not violate Strickland's equal-protection rights. So even if the FDO's lack of training on how to handle sexual-harassment complaints created a risk that judiciary employees would respond inadequately to sexual-harassment complaints, that risk did not materialize in Strickland's case.

This ends our inquiry with respect to Strickland's deliberate-indifference claim against Martinez. Strickland's failure to prove the third prong of the test is fatal to that claim, so we need not address her arguments regarding the other prongs.

### ii.     The district court did not err in rejecting Strickland's claim that Martinez subjected her to a "mixture" of retaliation and discrimination

Strickland also argues that Martinez retaliated and discriminated against her for raising sexual-harassment allegations.  "[C]ontinued sexual harassment and adverse treatment of a female employee unlike the treatment accorded male employees remains actionable as a violation of the Equal Protection Clause even when the sex discrimination and harassment continue after, and partially in response to, the female employee's report of prior discrimination and harassment." *Strickland*, 32 F.4th at 357 (quoting *Wilcox v. Lyons*, 970 F.3d 452, 461 (4th Cir. 2020)) (emphasis removed).  When an employee is subjected to "a mixture of retaliation and continued sexual harassment," the conduct violates equal-protection rights by "maintain[ing] and reinforc[ing] the hostile work environment that [the harassing supervisor] had created." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

At trial, Strickland raised a litany of allegedly retaliatory incidents.  The district court did not clearly err in concluding that none of them were in fact retaliatory or motivated by gender-based discrimination.  It found that:  "Martinez did not remove Strickland off of the path of becoming an AFPD [Assistant Federal Public Defender]" when "[n]either Martinez, nor Strickland's offer letter, promised Strickland that she would be an AFPD by a certain time," *Strickland*, 744 F. Supp. 3d at 581–82; Martinez did not consider Strickland for the open AFPD role because "it was identical to the position that she already had," *id.* at 583; Strickland's responsibilities were diminished because "the FDO management team was . . . adjusting its workload after the departure of another [Research

35

and Writing Specialist],” *id.* at 584; Martinez assigned a “gatekeeper” to “protect Strickland from further contact with Davis,” not to demote her, *id.* at 585; “Strickland’s locality pay was not removed and . . . Martinez [did not] attempt[] to remove it,” *id.* at 586; Martinez did not backdate forms to make her ineligible for a promotion, but rather “the timing of Strickland’s conversion [was] simply a coincidence,” *id.* at 588; Strickland was not “forced to telework,” but rather “[she] requested to telework,” and there was “a genuine lack of office space in Asheville,” *id.* at 588–89; and, finally, the pay raise given to a male attorney in a similar role soon after Strickland’s resignation was not discriminatory, but rather the correction of an “administrative oversight,” *id.* at 583.

All of these findings are amply supported by the record.  We therefore reject Strickland’s contention that the district court committed clear error in ruling against the equal-protection claim that she based on the above “mixture” of retaliation and discrimination allegations.

### iii.    *The district court did not err in granting summary judgment in favor of Ishida and Chief Judge Gregory*

We similarly are unpersuaded by Strickland’s somewhat abbreviated argument regarding the grant of summary judgment in favor of Ishida and Chief Judge Gregory.  A grant of summary judgment is reviewed de novo, drawing “[a]ll inferences . . . in a light most favorable to the non-movant.” *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011).  Although Strickland argues that Ishida’s actions demonstrated that he “sided with Martinez” and that he therefore treated male supervisors more favorably, the district court properly concluded that “[t]his evidentiary gap is simply too great to bridge.”  The record

lacks evidence to support the third and fourth prongs of Strickland's equal-protection claim against Ishida—*deliberate* inaction or a cover-up and an *intent* to treat Strickland worse because of her sex. *See Strickland*, 32 F.4th at 359. The court therefore properly granted summary judgment in favor of Ishida.

Similarly, Strickland asks us to infer discriminatory intent from Chief Judge Gregory's decision not to disqualify Martinez from the investigative process, and from his "hands-off" approach to the investigation itself. But Strickland failed to present any evidence from which such a conclusion could reasonably be drawn. The district court therefore properly granted summary judgment in favor of Chief Judge Gregory.

### iv.    *Any error in excluding the Me Too evidence was harmless*

The next issue before us is the district court's disposition of the Me Too evidence. We assume, without deciding, that the court abused its discretion in excluding the Me Too evidence both at summary judgment and at trial. This leaves Strickland with the burden of showing that the error was not harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). In considering the question of harmlessness, we evaluate "'the likelihood that the result would have been different,' as well as how the error might impact the public perception of such proceedings." *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253–54 (4th Cir. 2016) (quoting *Shinseki*, 556 U.S. at 411); *see also Coastal Coal Co., LLC v. Harrison*, No. 22-2122, 2024 WL 3042895, at *1 (4th Cir. June 18, 2024) ("An error is harmless when we can conclude with confidence that no reasonable [factfinder], after fully considering the evidence, could have reached a different result."). The parties here focus on the likelihood of a different result.

37

We first address any potential effect of the Me Too evidence on the bench-trial ruling that Martinez was not deliberately indifferent to Strickland's sexual-harassment complaint. As previously discussed, the district court concluded, and we agree, that Martinez acted swiftly and reasonably effectively in response to Strickland's complaint. The Me Too materials show only that Martinez was accused of acting less reasonably in response to other, unrelated complaints of discrimination or harassment, and that he allegedly engaged in unrelated gender-based discrimination.

Such evidence might have affected the district court's analysis of the other elements of the deliberate-indifference test—most notably, the element of discriminatory intent—but it is not relevant to the deliberate-indifference prong as it relates to Strickland. Martinez's actions in response to Strickland's report of sexual harassment were quite reasonable, and nothing in the sealed materials undermines that conclusion.

Next, we address whether the Me Too evidence would have affected the district court's conclusion that Martinez did not engage in a mixture of retaliation and sex discrimination. Regarding this theory, Strickland argues primarily that the materials would have altered the court's analysis of the timing of her promotion to an AFPD. She also points to the alleged "elimination" of her locality pay and the confusion about her precise pay grade, as well as the promotion received by another staff attorney on the day after Strickland resigned. The court determined, however, that Strickland's argument that these actions were motivated by discrimination or retaliation was too speculative. We conclude that the sealed materials would not have swayed a reasonable factfinder from that conclusion.

38

The probative value of the Me Too evidence with regard to the issue of Martinez's discriminatory intent is not zero, but it is exceptionally weak. Those materials contain only *allegations* of misconduct, with no findings of misconduct for any of the complaints. And the materials are one-sided; the record contains no response by any of the accused persons or other potential witnesses. For these reasons, we find that that any error in excluding these materials was harmless with regard to the district court's conclusions after trial.

Finally, we address whether the exclusion of the Me Too evidence had any effect on the district court's grant of summary judgment in favor of Ishida and Chief Judge Gregory. This issue requires little analysis because none of the sealed materials contains any allegation of impropriety by either of them. So even assuming that Ishida and Chief Judge Gregory were aware of the allegations against Martinez and others, that would not show that either of them had discriminatory intent or that their actions during Strickland's unrelated proceedings amounted to deliberate indifference. Accordingly, any error by the district court in declining to consider the Me Too evidence at the summary-judgment stage of the case was harmless.

## D.    Exclusion from Title VII

Strickland further argues that the exclusion of judiciary employees from the civil-rights protections that Title VII provides to other federal employees is unconstitutional. This exclusion, she contends, infringes on her fundamental right to be free from sex discrimination and is arbitrary.

Strickland, however, raises her argument for the first time in her appeal from the district court's final judgment. As the government points out, "[t]his court has repeatedly

39

held that issues raised for the first time on appeal generally will not be considered and that exceptions to this rule exist only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Strickland*, 32 F.4th at 353 (quoting *Kadel v. N.C. State Health Plan for Teachers & State Emps.*, 12 F.4th 422, 430 (4th Cir. 2021)) (cleaned up).

Strickland does not argue that exceptional circumstances justify a departure from this general rule. She has had "ample opportunity" to litigate her case, including a prior appeal to this court. Declining to consider an issue that was raised for the first time five years into the litigation does not constitute a "miscarriage of justice." *See id*. We therefore decline to reach the merits of her Title VII argument.

## E.    Motion to unseal

There remains pending Strickland's motion to publicly file an unredacted version of her opening brief and a version of the Me Too evidence that contains some redactions regarding the names of the complainants and some unaccused third parties. Access to judicial records is "protected both by common law and by the First Amendment." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988); *see also, United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 171–72 (4th Cir. 2024) (holding that the First Amendment applies to documents related to summary judgment, even if the motion is denied for reasons unrelated to those documents).

We review de novo a ruling on sealing under the First Amendment. *Va. Dept. of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004). Under the First Amendment, "public access promotes not only the public's interest in monitoring the

functioning of the courts but also the integrity of the judiciary." *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014). "Public access serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." *Id.* (quoting *Littlejohn v. Bic Corp.*, 851 F.2d 673, 682 (3d Cir. 1988)). The right of public access includes "the ability to access documents submitted in conjunction with [open] proceedings, for only then can members of the public truly understand what has occurred therein." *Oberg*, 105 F.4th at 173.

And that right "may be abrogated only in unusual circumstances." *Doe*, 749 F.3d at 266 (quoting *Stone*, 855 F.2d at 182). "[A]ccess may be restricted only if closure is necessitated by a compelling government interest and the denial of access is narrowly tailored to serve that interest." *Oberg*, 105 F.4th at 171 (quoting *Doe*, 749 F.3d at 266). "The court must consider less drastic alternatives to sealing and, if it decides to seal the documents, must 'state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review.'" *Stone*, 855 F.2d at 181 (quoting *In re Knight Publishing Co.*, 743 F.2d 231, 235 (4th Cir. 1984)).

"Though the First Amendment poses a high bar . . . [,] it is not insurmountable." *Oberg*, 105 F.4th at 171 n.8. This court has recognized sufficiently compelling governmental interests in "protecting a defendant's right to a fair trial before an impartial jury," *id.*; protecting "a minor victim's wellbeing," *id.*; and "risks to national security," *Doe*, 749 F.3d at 269. Perhaps most relevant here, this court has held that "protecting the

41

privacy rights of trial participants such as victims or witnesses" can be a sufficiently compelling governmental interest to allow sealing. *Id.*

The EDR Plan ensures confidentiality to complainants. Among other things, it provides that "[a]ll individuals involved in the investigation shall protect the confidentiality of the allegations of wrongful conduct to the extent possible" and that, "[u]nless waived by the employee, the Court or employing office shall protect the confidentiality of allegations filed under this Plan to the extent possible." Several of the complainants, including Strickland, expressed frustration about a lack of confidentiality and hesitation to take actions because of those concerns.

To the extent that Strickland argues that ensuring the privacy rights of the complainants is not a sufficiently compelling governmental interest to warrant sealing, we disagree. Protecting their privacy rights in the circumstances here is akin to the compelling governmental interest in "protecting the privacy rights of trial participants such as victims or witnesses." *See id*. Nothing suggests that, simply because another complainant with similar circumstances files a public lawsuit, the privacy rights of other complainants must yield. Each complainant is permitted to waive confidentiality individually, but none has done so here. Moreover, adopting Strickland's rule would chill the filing of future complaints, undermining the important protections afforded to complainants by the EDR Plan.

Strickland correctly points out that this case raises novel theories and that the government is itself effectively the defendant. But those factors do not, in our view, outweigh the significant privacy interests of the government-employee complainants, as

42

well as innocent third parties, that would be eviscerated by an order unsealing their complaints.

Strickland makes two additional arguments in her motion to unseal. First, she argues that the materials already have been publicly disclosed. Remarkably, she points to her own questionable actions as the source of the public disclosure. The district judge permitted her to make an offer of proof to the court reporter in his absence, and he then left. Strickland then began her offer of proof and apparently displayed some of the sealed materials in court.

The government's lawyer suggested that displaying the documents was inappropriate. Strickland started arguing, prompting the clerk of the court to intervene: "Excuse me. Excuse me. Excuse me. We are not in court right now, there's no need to display any evidence, we are simply making an offer of proof, as requested, with the Court Reporter." Strickland then presumably stopped displaying the sealed materials. The district court accurately, if dryly, summarized the effect of this conduct: "The plaintiff's offer of proof did not operate to waive the designation." We agree.

Strickland's second argument is that the privacy rights of the complainants do not justify the extent of the sealing ordered by the district court. She points out that we "must consider less drastic alternatives to sealing." *See Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 181 (4th Cir. 1988). Strickland also points out that, in *Stone*, where the district court sealed the entire case with some minor exceptions, this court held that "[t]he breadth of that order is particularly troubling, because it would be an unusual case in which alternatives could not be used to preserve public access to at least a portion of the

43

record." *Id*. at 182. She asserts that the same principle applies here, suggesting that fewer redactions could be made.

But the breadth of the redactions here is tiny compared to the record as a whole. The record is enormous, and only one set of documents—Trial Exhibit BB—is redacted, which has caused limited redactions in other documents when those documents refer to the content of Exhibit BB. The "troubling" aspect in *Stone* was the wholesale sealing of the entire record. This case is not at all akin to *Stone*.

Nor has Strickland proffered what redactions could be omitted without revealing the identities of the complainants and otherwise protecting their privacy. Her backup request is that, "[a]t a minimum," the opening brief should be unsealed. But the opening brief clearly contains information that would allow even a moderately informed observer to identify some complainants. For these reasons, we deny her motion to unseal.

## F.      Motion for summary reversal

This leaves us with Strickland's motion for summary reversal, which she filed in late 2024, before briefing had begun. She argued that the district court abused its discretion by permitting pro bono counsel to withdraw from representation and that the error warranted immediate reversal. Fourth Circuit Rule 27(f)(1) permits a motion for summary reversal in extraordinary cases:

> Motions for summary affirmance or reversal filed prior to completion of briefing should include a showing that the issues raised on appeal are in fact manifestly unsubstantial and appropriate for disposition by motion. Absent such a showing, the Court will defer action on the motion until briefing is complete.

R. 27(f)(1). We determined that Strickland had not made the requisite showing, and

44

we accordingly deferred ruling on the motion until the completion of briefing, so we will analyze it now.

Before the completion of briefing, "the standard for obtaining a summary reversal of a lower court's judgment is strenuous." *United States v. Brookins*, 345 F.3d 231, 237 n.6 (4th Cir. 2003). "[S]ummary reversal does not decide any new or unanswered question of law, but simply corrects a lower court's *demonstrably erroneous* application of federal law." *Id.* (internal quotation marks omitted) (emphasis in original); *see also James A. Merritt & Sons v. Marsh*, 791 F.2d 328, 331 (4th Cir. 1986) ("Summary reversals are reserved for extraordinary cases.").

This court has provided little precedential guidance on the appropriate standard for resolving a motion for summary reversal after briefing has been completed. Because we deferred ruling on the motion on an urgent basis, the stringent standard of review may pass out of the picture, leaving us with an ordinary assessment of the issue, as if Strickland had raised the issue in her briefs. *Cf. Padilla-Ruiz v. Commc'n Techs., Inc.*, 793 F. App'x 200, 200 (4th Cir. 2020) (unpublished) (denying, after full briefing, a motion for summary affirmance and then assessing the merits of the arguments without regard to Rule 27(f)'s strict standard); *United States v. Hill*, 771 F. App'x 195, 196 (4th Cir. 2019) (unpublished) (same). Strickland, on the other hand, declined to mention the issue in her briefs, so continued application of Rule 27(f)'s narrow scope may be warranted. In the present circumstances, we need not opine on those possibilities. For the reasons that follow, we conclude that no reversible error occurred. We deny the motion for summary reversal under either standard.

45

### i.   *Background on counsel's motion to withdraw*

Strickland's husband, a licensed attorney, has represented her throughout this case, and Strickland herself argued this case on appeal.  During discovery and the proceeding with regard to the government's motion to dismiss, a pro bono team, including Harvard Law School professor Jeannie Suk Gersen, provided additional representation.  Strickland claims that, at a deposition, a lawyer for the government "raised a sensational insinuation" about Strickland.  Shortly thereafter, her pro bono lawyers filed a joint motion to withdraw. They represented that a "conflict ha[d] arisen" such that they could no longer continue their representation and that there were "irreconcilable differences in the attorney-client relationship."

Strickland did not timely oppose the motion to withdraw.  Instead, she requested that the district court delay deciding the motion for an unspecified period of time. Strickland's pro bono attorneys then filed a brief reply requesting that the court rule on the motion immediately.  The next day, the court entered a text-only order, ruling that, "[s]ufficient time having elapsed for the plaintiff to object to the motion to withdraw and only a request for delay having been received by the Court, the motion to withdraw is ALLOWED."

Strickland's motion requires us to answer two questions:  (1) whether the district court erred in granting the motion to withdraw and, if so, (2) whether summary reversal of the court's final judgment is warranted.

### ii.   *The district court erred in granting counsel's motion to withdraw*

We review the district court's decision to grant a motion to withdrawal under the

46

abuse-of-discretion standard. *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1142–43 (4th Cir. 1990). "A district court abuses its discretion only if its conclusions are based on mistaken legal principles or clearly erroneous factual findings." *Hunter v. Town of Mocksville*, 897 F.3d 538, 561 (4th Cir. 2018) (internal quotation marks omitted).

Strickland urges us to analyze the district court's exercise of its discretion by applying the test defined in *United States v. Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014). *Blackledge* instructs the appellate court to review, among other things, the "adequacy of the [district] court's inquiry" and "whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." *Id.*

But *Blackledge* concerned a motion to withdraw in a criminal case. As the government points out, such a withdrawal implicates very different concerns from the present civil case. Strickland has no Sixth Amendment right to counsel, and she remained represented throughout the proceedings by her husband and herself. She has not cited any authority applying *Blackledge* in a civil context, and we likewise decline to apply it.

Moving on to the merits of the district court's decision, motions to withdraw in the Western District of North Carolina are governed by local rule LCvR 83.1(f). *See Spann v. N. Carolina Dep't of Pub. Safety*, No. 1:17 CV 104, 2017 WL 6041939, at *1 (W.D.N.C. Dec. 6, 2017); *ChampBoat Series, LLC v. In2Focus Films, Inc.*, No. 3:09-CV-183-RJC-DCK, 2009 WL 10728587, at *1 (W.D.N.C. Nov. 16, 2009). LCvR 83.1(f) allows an attorney to withdraw with leave of the court if she has "good cause" or the consent of her client.

The district court's stated reason for granting pro bono counsel's motion to

withdraw in the present case was Strickland's failure to file an opposition to the motion. It plainly did not conduct a good-cause analysis of any kind. Because that reasoning is at odds with the requirements of LCvR 83.1(f), the court abused its discretion in summarily granting withdrawal.

The government responds by pointing out that the district court had especially broad discretion in this case because Strickland remained represented by counsel. As the government notes, "it is not clear what sort of extreme circumstances would need to be present to provide a colorable basis for reversing a district court's order that allowed some (but not all) of a civil plaintiff's lawyers to withdraw their appearances."

There is no question that Strickland's remaining representation would reduce any concerns about prejudice and could have factored into a good-cause analysis. But the local rules governing withdrawal do not impose a different standard when a plaintiff is represented by other counsel. Instead, the standard for any withdrawal, absent client consent, is good cause. A district court's failure to analyze good cause is therefore a valid basis for the reversal of its order granting withdrawal. Accordingly, the district court erred in granting pro bono counsel's motion to withdraw.

### iii.    *Reversal is unwarranted*

Having determined that the district court erred in allowing withdrawal, we now analyze whether that error justifies reversal. As an initial matter, the record suggests that the district court's error was more technical than substantive, and we conclude that the error did not ultimately prejudice Strickland at trial. The court would have been within its discretion to find good cause based on pro bono counsel's representation of irreconcilable

48

differences and based on Strickland's failure to object to withdrawal. *See Iskander v. Otay Mesa Det. Ctr.*, No. 24-CV-01572-GPC-VET, 2024 WL 4983155, at *2 (S.D. Cal. Dec. 3, 2024) (finding good cause where counsel cited irreconcilable differences and that his "client [was] not cooperating"); *but see In re God's Mercy, LLC*, 285 F. Supp. 3d 904, 908 (E.D. Va. 2018) ("Counsel's sole factual proffer is that 'irreconcilable differences and conflict' exist between him and the Claimant. . . . On the basis of this single assertion, the court cannot determine whether any of the [applicable] conditions for withdrawal are satisfied." (citation omitted)).

Furthermore, a finding that the withdrawal prejudiced Strickland at trial necessitates an assumption that the district court would have required counsel to continue representing Strickland in a pro bono capacity through the end of the case despite counsel's protestations of irreconcilable differences. Any such requirement would have been clearly unreasonable. Moreover, Strickland has not cited a single civil case in which this court or any other has vacated a judgment on the basis of an improper withdrawal of counsel. Because we conclude that no reversible error occurred, we deny the motion for summary reversal.

## III.    CONCLUSION

For all of the above reasons, we **AFFIRM** the district court's bench-trial and summary-judgment rulings and **DENY** Strickland's motion to unseal and her motion for summary reversal.

49